IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA     *
                            *   Case No. 1:09CR233-1
vs.                             *
                            *   Greensboro, North Carolina
JULIO SPIRO DIBBI,          *   May 27, 2010
                            *   9:45 a.m.
             Defendant.   *
*****************************

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE N. CARLTON TILLEY, JR.,
UNITED STATES SENIOR DISTRICT JUDGE.

APPEARANCES:

For the Government:        FRANK J. CHUT, JR., ESQUIRE
                           Assistant United States Attorney
                           Post Office Box 1858
                           Greensboro, North Carolina 27402

For the Defendant:         WALTER C. HOLTON, JR., ESQUIRE
                           301 North Main Street, Suite 804
                           Winston-Salem, North Carolina 27101

Court Reporter:           Lori Russell, RMR, CRR
                           P.O. Box 20593
                           Winston-Salem, North Carolina 27120

Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

1          THE COURT:  Good morning.

2          MR. CHUT:  Good morning, Your Honor.  Your Honor,

3   we need to just shift personnel because Mr. Holton has

4   stepped out to address an issue.

5      Mr. Holton is coming in.  The first case will be Julio

6   Spiro Dibbi, 1:09CR233-1.  This is on for sentencing, Your

7   Honor.  Mr. Holton represents Mr. Dibbi.

8      (Mr. Holton approached with the Defendant.)

9          MR. HOLTON:  Good morning, Your Honor.

10         THE COURT:  Good morning, Mr. Holton.

11     Mr. Dibbi, have you read your presentence report?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Have you discussed it with Mr. Holton?

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  Mr. Holton, would you tell me about

16  objections?

17         MR. HOLTON:  Your Honor, we raised no objections

18  to the presentence report.

19         THE COURT:  And are you in agreement with that,

20  Mr. Dibbi?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Mr. Chut, would you tell me about the

23  Government objections?

24         MR. CHUT:  Your Honor, the Government has no

25  objections.  There is an issue we would like to put on the

1   record as to restitution, but we have no objections to the

2   report.

3           THE COURT:  There being no objections, I will

4   adopt both the factual findings and the guideline

5   applications that are in the report.  Total offense level is

6   a 19.  The criminal history category is a I.  The advisory

7   imprisonment range is 30 to 37 months.  The supervised

8   release range is 1 year.  The fine range, 6,000 to 60,000;

9   and there's a $200 special assessment representing $100 for

10  each of the two counts.

11          Will there be evidence, Mr. Chut?

12          MR. CHUT:  Not on the sentence, Your Honor.  There

13  may be evidence on the restitution issue, Your Honor.

14          THE COURT:  Okay.  You-all are not in agreement on

15  the amount of restitution?  Is that --

16          MR. CHUT:  Your Honor, it's -- there's two issues,

17  Your Honor.  One of which is in general our office and

18  probation have evolved a position on preparer cases like

19  this.  The restitution is functionally impossible to

20  calculate because of the interplay of the IRS collection

21  efforts and probation.

22          In this particular situation, two of the years,

23  because of the civil statutes, are not collectible by the

24  IRS.  Mr. Dibbi agreed to pay restitution in his plea

25  agreement and the United States' position would be that

1    while normally we're not going to ask for restitution in tax

2    preparer cases, in this particular case, there are two years

3    that are not collectible by the Internal Revenue Service,

4    approximately $160,000 in tax loss, that we would ask for

5    restitution.

6          Mr. Holton raised the concern that he believed that at

7    the change of plea there had been a discussion of

8    restitution and the Court's position was this was only

9    for -- restitution was not for related conduct, but only on

10   the particular counts.  I do not recall that, Your Honor.  I

11   may be right or wrong.  I don't know.

12         So that's where the restitution issue is in a

13   nutshell, Your Honor.  We have the revenue officer, Copely

14   from the Internal Revenue Service, if testimony is needed

15   about the loss amount for the two particular years, Your

16   Honor.

17              THE COURT:  Mr. Holton, have you acquired a

18   transcript of the --

19              MR. HOLTON:  Yes, I have, Your Honor.  And this

20   issue just came up when I walked in the courtroom; so,

21   unfortunately, I did not bring it from my office as I was

22   not aware of this issue.

23         But I believe at the time the plea agreement was

24   accepted the Court asked the Government the question:  Is

25   restitution limited to the counts in the indictment or is it

1    to other matters?  I believe the answer was it's limited to

2    the counts in the indictment.

3         My secretary right now is trying to find that

4    transcript.  Had I known the issue was on for discussion, I

5    certainly would have brought it.  I just became aware of the

6    issue when I walked in this morning.

7              THE COURT:  Okay.

8              MR. CHUT:  And, Your Honor, that is correct.  We

9    discussed this case.  I really didn't think it was an issue

10   because he agreed to pay restitution.  This, in fact, would

11   be a benefit for Defendant, but -- so Mr. Holton is correct

12   about that.  So there's a problem with that.  I should have

13   foreseen to discuss it with him, but I thought that -- I

14   thought that was something of benefit to the Defendant, Your

15   Honor, would be unobjectionable; but I was unaware --

16             THE COURT:  You need to speak up.  There's a

17   blower on over our heads.  You're speaking fast and dropping

18   your voice.

19             MR. CHUT:  I'm sorry, Your Honor.  I thought this

20   would be of benefit to the Defendant as he agreed to pay

21   restitution, Your Honor, so I did not think it was an issue.

22             THE COURT:  What would be a benefit?

23             MR. CHUT:  The lesser restitution, Your Honor, as

24   opposed to the full $262,000 in tax loss.

25             THE COURT:  That means you recall having made that

1   statement during the plea?

2           MR. CHUT:  I do not recall, Your Honor, making

3   that statement.  If I made that statement, obviously, I'll

4   be bound by it.  I do not recall --

5           THE COURT:  What did you think was a benefit to

6   the Defendant?

7           MR. CHUT:  That he would have lesser restitution,

8   Your Honor.  In his plea agreement, he agreed to pay the tax

9   loss and we were actually going to ask for less than the tax

10  loss.

11          THE COURT:  Okay.  We'll take a break and see if we

12  can find what happened during that proceeding.

13          Take a recess, please.

14          (A recess was taken from 9:50 a.m. until 9:52 a.m.;

15  all parties present.)

16          THE COURT:  The transcript has not been filed in

17  this matter.  I have the realtime, which I save on my

18  computer on a daily basis.  My computer is here.  I am going

19  to look at that.

20          If anybody in the main part of the courtroom needs to

21  talk, right now you may be excused to go outside; but there

22  will be no talking in the courtroom while I'm doing this

23  because it distracts me from what I'm trying to do.  So if

24  you would like to talk, it's fine to go out in the hall.

25  You may be excused now to do that.  Otherwise, just please

1    don't carry on any conversation.  But if you want to go in

2    the courtroom (sic), do it now.  Don't start going out two

3    at a time.  If anybody wants to go, you're free to go right

4    now.  Okay.

5        (Pause in the proceedings.)

6        THE COURT:  Marshal, how about not letting anybody

7    else in the courtroom while I'm doing this.

8        You folks who have just come in, you're welcome to

9    stay in here; but if you want to talk to anybody while I'm

10   looking at my computer for something, please go back out in

11   the hall.  You're free to stay.  You're free to leave.  But

12   if you want to leave, please do it now before I get to work

13   on this instead of going out at a later time.

14       (Pause in the proceedings.)

15       THE COURT:  Okay.  Mr. Holton must have wanted to

16   talk to somebody.  Would somebody get Mr. Holton?  Thank

17   you, sir.

18       (Gentleman in audience left the courtroom and

19   subsequently returned.)

20       GENTLEMAN IN AUDIENCE:  Your Honor, he was not out

21   in the hall, sir.

22       THE COURT:  Thank you very much for looking.

23       (Pause in the proceedings.)

24       (Mr. Holton returned to the courtroom.)

25       THE COURT:  Mr. Holton and Mr. Chut, approach the

1    bench, please.

2         (The following bench conference was recorded.)

3         THE COURT:  This has not been cleaned up, but you

4    can page down when you get --

5         (Counsel reviewing realtime from previous court session

6    on the Court's computer.)

7         THE COURT:  Are you ready?

8         MR. CHUT:  Yes, Your Honor.

9         (Realtime from previous court session continued to be

10   reviewed by counsel.)

11        THE COURT:  My reading of that is there was an

12   agreement to pay restitution for all of it.

13        MR. HOLTON:  For all losses occasioned in the

14   counts of the indictment.

15        THE COURT:  That's my reading.

16        MR. HOLTON:  I have no objection to that.

17        MR. CHUT:  I think that's reasonable, Your Honor.

18   It's on the record and I think -- I think that's --

19        THE COURT:  Let's don't argue it here.

20        MR. CHUT:  Yes, Your Honor.

21        THE COURT:  Do you wish to get your transcript

22   from your office?

23        MR. HOLTON:  No.  That's my recollection of the

24   discussion.

25        THE COURT:  Okay.

1     (Conclusion of the bench conference.)

2          THE COURT:  Okay.  As I was saying at the bench,

3     my reading of that is that the agreement was to pay

4     restitution for any actual losses occasioned by charges in

5     the indictment, not just Counts One and Two.

6       Is that your reading of this as well?

7          MR. CHUT:  Yes, Your Honor.  I guess that raises a

8     second issue; but that is my reading, Your Honor.

9          THE COURT:  And is that yours, Mr. Holton?

10         MR. HOLTON:  Yes, sir, that's my recollection of

11    the discussion.

12         THE COURT:  Okay.  Now, where does that take us

13    then?

14         MR. CHUT:  Your Honor, I guess the issue is does

15    that preclude related conduct to those acts.  If it's -- if

16    that means the Government is barred for losses from the

17    related conducts -- like many of these cases, there are very

18    many taxpayers, as laid out in the PSR, whose returns were

19    done with false deductions.  So one possibility is that bars

20    the United States from related conduct.  In which case, the

21    majority of these counts are in the time period where the

22    IRS can collect, so there would be a very small restitution

23    calculation.  If it does not limit the United States

24    Government to the related conduct, then it's an issue --

25    we're back at the issue, Your Honor, of restitution for the

1   years we can't collect from.

2        THE COURT:  And are you taking the position that

3   related conduct is included and what have you done to

4   prepare that for presentation today if so?

5        MR. CHUT:  Your Honor, in terms of presenting, I

6   have both the case agent and the revenue officer who can

7   testify.

8        THE COURT:  But in alerting the Court that was an

9   issue.

10       MR. CHUT:  I have not alerted the Court that was

11  an issue because that was not something I perceived to be an

12  issue.

13      And I also -- also, if you read -- that read as a face

14  statement, Your Honor, says loss for the counts.  It does

15  not say related conduct.  So I think Mr. Holton would have a

16  reasonable argument that the exact words of that, Your

17  Honor, say actual counts and not -- whatever my intention

18  was in my mind, Your Honor, it says actual counts; and I

19  think there is certainly an argument the United States

20  should be bound by the actual words and not what might have

21  been in my head at the time.

22      I personally don't think it was my intention to cut

23  off tax loss.  However, it does say, Your Honor, actual

24  counts.  I think that's the interpretation we're going to

25  have to take in fairness, Your Honor, for this.  We can

1    present –– Mr. Holton has not had notice and the Court has

2    not had notice, but we certainly can present evidence.  But

3    I think on the face of that transcript it says actual

4    counts, Your Honor, so I think I'm bound by those words,

5    Your Honor.

6           THE COURT:  Then will there be evidence from the

7    Government?

8           MR. CHUT:  May I confer with my case agent

9    briefly, Your Honor?

10          THE COURT:  Sure.

11       (Pause in the proceedings.)

12          MR. CHUT:  Your Honor, there will be no evidence,

13   Your Honor.  We're going to go ahead –– now that we've

14   reviewed the transcript we'll go ahead and agree with the

15   restitution by probation, which will be the standard

16   position this office takes in the future in these cases

17   anyway.  So that's what we'll do, Your Honor.

18          THE COURT:  Will there be evidence, Mr. Holton, on

19   Mr. Dibbi's behalf?

20          MR. HOLTON:  No evidence, Your Honor.  I've

21   previously submitted a position paper and some letters, but

22   beyond that nothing further.

23          THE COURT:  Okay.  Then I'll be glad to hear from

24   you.

25          MR. HOLTON:  Thank you.  May it please the Court,

1    good morning, Your Honor.

2        I've been working with Mr. Dibbi on this case for

3    about three years now or so and I've really grown to like

4    him, which sometimes makes representing people difficult;

5    but as I've said -- as said in the presentence report and as

6    stated in my position paper, Mr. Dibbi has, obviously, pled

7    guilty to these acts.  He has, I believe, accepted

8    responsibility and ask the Court to find that he has

9    accepted responsibility.  He has not challenged any of the

10    findings of tax loss and he accepts that that -- that they

11    are, in fact, accurate and accepts responsibility for that.

12        Julio is 74 and I've watched him over the last three

13    years.  He came to my office during the course of this

14    investigation, part of it; but I've watched his health

15    decline in a way that is fairly sad.  His wife died not too

16    long ago.  He has the condition of myleofibrosis, which is

17    sort of a precursor to leukemia.  Two years ago in '07 he

18    was unable to walk due to the weakness of his bones and

19    joints.  He was admitted to the hospital.  He was treated.

20    He now undergoes treatment for that condition that do, in

21    fact, allow him to walk and to move around much better than

22    he did at the time.

23        The big concern in his case is the -- the bone

24    marrow -- loss of bone marrow and the affect that has on his

25    blood system and his blood count and his hemoglobin levels.

1    He takes every three weeks a shot, which is Aranesp, at

2    Baptist Hospital.  They give him the shot only when his

3    hemoglobin levels are below a ten.  They have been below

4    a ten every time he's been there for the past several

5    months -- past several years.

6         So what I have requested -- and I'm sure the Court has

7    seen without repeating the letters from physicians -- is to

8    consider a variance from the recommended guidelines in this

9    case based upon an extraordinary physical impairment similar

10   to the case decided by Judge Britt in Raleigh.  I believe,

11   you know, there are other cases -- some cases where people

12   qualify, other cases where they don't.  But I do sincerely

13   believe in Mr. Dibbi's case it is a situation where the cost

14   to the Government of imprisonment for him as compared to

15   home confinement, strict monitoring -- the cost to the

16   Government would be enormous, in the $60,000-a-year range

17   currently.  But beyond that, his -- with his physical

18   condition -- this, again, is no excuse for the conduct.

19   We're just very concerned about his ability to actually live

20   while in prison.

21        I would ask the Court, however, to consider if there

22   is a term of incarceration recommending Butner or the best

23   medical facility that would be within this area so he can be

24   close to friends and family at least and close to -- his

25   doctors are all in Winston-Salem if they are -- if they are

1    needed.

2         But I do think, Your Honor, in the 20 years or so that

3    I've had the pleasure to appear before you that there have

4    only been two cases, one a mental competency case, and one

5    a -- this case where I thought the medical condition of my

6    client was a substantial factor in the Court's consideration

7    for sentencing.

8         Mr. Dibbi has been strong.  He's been cooperative with

9    me.  He's come to my office for appointments.  He's stayed

10   in touch.  He's been a very good client for me to work with,

11   but he -- but he, myself, his doctors and his family, we are

12   concerned about his physical condition and ask the Court to

13   consider that.

14             THE COURT:  Thank you, Mr. Holton.

15             MR. HOLTON:  Thank you.

16             THE COURT:  Mr. Chut.

17             MR. CHUT:  Your Honor, the United States would ask

18   for a sentence within the range as suggested and would

19   certainly not object to a placement at Butner or someplace

20   else to deal with any health issues Mr. Dibbi has, Your

21   Honor.  We think the recommendation is reasonable

22   considering the seriousness of the conduct which caused

23   enormous difficulty for the collection of revenue for the

24   United States, and we think it's appropriate and takes into

25   account the sentencing factors, Your Honor.

1    THE COURT:  Mr. Dibbi, I'll be glad to hear

2  anything you'd like to say.

3    (Discussion between Mr. Holton and the Defendant.)

4    THE COURT:  You may come up closer to the bench,

5  if you would like, in order to do that.  If you need to be

6  seated, Mr. Holton can pull a chair up here.

7    (Discussion between Mr. Holton and the Defendant.)

8    THE DEFENDANT:  Yes, Your Honor.  My health is in

9  a very deterioration (sic) position.  I've been going

10  backward for last three years.  I can't drive.  I'm just in

11  bad shape physically.  That's it, Your Honor.

12    THE COURT:  I'm sorry?

13    THE DEFENDANT:  That's it, Your Honor.

14    THE COURT:  Okay.  Thank you, sir.

15    Now, there is no question that there are some things

16  that would call for the Court to consider a sentence lower

17  than the advisory guideline range, as reflected in the

18  presentence report.  Your health certainly is of some

19  concern, especially the polymyalgia situation.  You also --

20  neuropathy of the feet, some troubles with vertigo, acid

21  reflux and medications that you take and your age at 73 is a

22  consideration.  None of those I evaluate as a reason to

23  depart downward under the guidelines.  None of those is so

24  extraordinary that it would call for a departure.  The

25  question is whether or not other factors in the statutes

1   relating to sentencing would call for a sentence that would

2   be below that advisory range.

3        Factors that would call for a sentence within or above

4   that advisory range would include these:  You were born in

5   another country and you came at a fairly early age to this

6   country with your family.  I don't know whether you were

7   naturalized as a citizen or not because the presentence

8   report is silent on that or I missed it.

9        (Discussion between Mr. Holton and the Defendant.)

10            THE DEFENDANT:  I came to this country when I was

11   17 years old, but I am an American citizen, Your Honor.

12            THE COURT:  Okay.  Well -- and you may be seated.

13   You know, most of us just happen out of chance to be born

14   here.  We had no choice about it.  The United States had no

15   choice about our being born here and we inherited the rights

16   that all who are born here get.  We made no selection in

17   coming here.  Nor did the country make a selection in taking

18   us as citizens.

19        But those who immigrate here are in a little different

20   situation.  Either they or the people who brought them here

21   saw something about this country that was more attractive

22   than the place that they left:  more rights, more

23   opportunities perhaps, more protections perhaps.  And for

24   somebody who comes here and chooses to stay whether -- if

25   they're brought here by someone else, they recognize and

1   understand the privileges that go with living in this
2   country, the services that are provided to people who live
3   in this country.
4         You have come here.  You have received an
5   undergraduate degree.  You've received a master's degree.
6   You've had responsible corporate positions with General
7   Motors, with Wrangler, with others.  You have established
8   yourself in business as -- in the accounting and auditing
9   business.
10        And taking all the benefits and services that go with
11  having done that, you have then turned around and in making
12  out income tax returns for others made fraudulent entries in
13  any number of returns resulting in the Government, which is
14  dependent on tax money to exist and provide those services
15  to people who live here, in being deprived of that.  You've
16  done it for years.  You've done it many times.  And then
17  when the Internal Revenue Service started investigating, you
18  called people and asked them to lie and to produce false
19  documentation to substantiate a lie.  Every one of those
20  things, in my thoughts, would call for a sentence above the
21  advisory guideline range.
22        The country that apparently has treated you well, you
23  have not returned that treatment in kind, at least not in
24  what you have done here.  I'm sure you have done some good
25  things; but when you consider what deterrent effect a

1   sentence will have, when you consider what others think is

2   fair punishment for what was done in a case, when you

3   consider what is just punishment for what was done in a case

4   and you consider what happened in this case -- that not only

5   did you repeatedly over a long period of time make

6   fraudulent representations to the Government, but then tried

7   to get others to lie to protect you -- that's not a

8   favorable circumstance.  That does not call for a variance

9   below the advisory guideline range for one day even

10  considering your physical condition.  Your physical

11  condition is not so serious it could not be properly cared

12  for in a United States penitentiary.  It certainly could be

13  cared for in the hospital facilities that the United States

14  Bureau of Prisons maintains.

15      Now, that I have set out my thoughts about that, I

16  would be glad to hear anything you would like to say about

17  that, either you, Mr. Dibbi, or Mr. Holton.

18      (Discussion between Mr. Holton and the Defendant.)

19          MR. HOLTON:  No, Your Honor, we respect the

20  Court's position, understand the Court's position.  The --

21  we would contend that the guidelines take into account the

22  obstruction issue that is in this case and as configured by

23  the guidelines.  Regardless of the restitution figure, the

24  punishment level is set based upon the total tax loss.  So

25  the -- you know, I have argued for a variance based upon

1    the --

2              THE COURT:  And very well, as you always do.

3              MR. HOLTON:  But in light of the -- and

4    understanding the factors the Court has set forth, we'd ask

5    the Court to, in offsetting the factors that we've

6    presented, consider the low end of the guideline, if the

7    Court would be so inclined.

8              THE COURT:  Why should there not be a $60,000 fine

9    in this case?

10             MR. HOLTON:  Well --

11             THE COURT:  That's within the advisory guideline

12   fine range.  Why should there not be considering that the

13   estimated cost of imprisonment is $23,400 approximately a

14   year and the Court is admonished to take that into

15   consideration?  And if he receives a sentence even at the

16   bottom of the advisory guideline range of 30 months, that

17   would be pretty close to the 60,000 right there.

18             MR. HOLTON:  Yes, sir.

19             THE COURT:  And the remainder -- there's much

20   money he has cost the Government the Government can't

21   recover.  Tell me why the fine shouldn't be $60,000.

22             MR. HOLTON:  The fine certainly could be.

23             THE COURT:  Tell me why it would work an undue

24   hardship.

25             MR. HOLTON:  Well, Mr. Dibbi is -- he is no longer

1    able to work; and, of course, if he's incarcerated, he

2    obviously will not work.  He has used a number of his

3    resources for his health purposes over the years.  He will

4    need them for health purposes when he --

5            THE COURT:  Well, they're being provided by the

6    Government while he is in custody.

7            MR. HOLTON:  That's correct.  But --

8            THE COURT:  He will have no extraordinary

9    expenses, will he, while he's in custody?

10           MR. HOLTON:  No, sir, he should not.

11           THE COURT:  So that leaves part of his worth

12   intact right there.

13           MR. HOLTON:  That does.  That does.  There

14   obviously will be some level of maintenance and so forth if

15   he maintains his -- tries to maintain his property or his

16   house.

17           THE COURT:  But I also noticed he sold some rental

18   property he had --

19           MR. HOLTON:  He did.

20           THE COURT:  -- recently, back in November.

21           MR. HOLTON:  He did.

22           THE COURT:  For an appreciable amount.

23           MR. HOLTON:  Right.  When his wife passed away, he

24   did not -- they had separate property.  He did not take

25   property under -- from her estate.  That went to her sister.

1    So, I mean, the property listed in the presentence report is

2    what he has.  Certainly his costs in prison would be more

3    than an average person due to the medical care, but I would

4    argue that it would not be necessarily just to penalize

5    someone because they are heavier than we might someone else

6    because their medical condition is poor.  I know that's --

7           THE COURT:  Well, he has cost the Government much

8    money the Government can't get back from him by what he has

9    voluntarily done.  There is no indication any of these

10   taxpayers asked him to do that, none whatever; and there's

11   every indication they were surprised to find out that had

12   been done when the investigators came to talk with them.

13   That may not be true; but based on the pattern that was

14   shown, it very well may be true that they did not know that

15   he was doing what he did.  Why would that be something

16   unreasonable to expect him to pay a fine to the Government

17   when he's already cost the Government so much money that

18   cannot be recouped?

19          MR. HOLTON:  Well, it's my -- it may be, Your

20   Honor.  It's my understanding that there were numerous

21   audits done.  Eighty percent of those audits or

22   approximately were accurate tax returns.  There were some

23   that were not accurate and I thought the Government had --

24   the taxpayers who had gotten money they were not supposed to

25   get, I believe the Government recouped that money from those

1   taxpayers along the way.  That was my understanding.  But

2   regardless, he did -- certainly caused the problem.

3           THE COURT:  What's the amount of restitution

4   that -- with regard to the relevant conduct Mr. Chut was

5   talking about that the Government has conceded to not seek

6   it in restitution today?  What's that amount?

7           MR. HOLTON:  According to the presentence report,

8   it was zero.  That's the figure that I had.

9           THE COURT:  Let me find out from Mr. Chut.

10          MR. CHUT:  The tax loss is $262,000, Your Honor.

11  The amount that we believe was not recoverable is

12  approximately 119,000.  Is that correct?  Potentially

13  $220,000 that's not collectible.

14       And I will note, Your Honor, one other issue.  This

15  isn't so much harm to the Government.

16          THE COURT:  Please speak up a little bit.

17          MR. CHUT:  Mr. Dibbi wreaked havoc with a lot of

18  his clients, Your Honor.  No one wants to hear from the IRS

19  as a taxpayer.  These folks ended up not only hearing from

20  the IRS, but hearing their tax returns were substantially

21  inaccurate, which obviously put them in a very difficult

22  position vis-a-vis the IRS.

23       Mr. Dibbi's conduct, as I noted very briefly before,

24  wreaked havoc with these folks, not only with the Government

25  in the collection of taxes -- and this is caught up in the

1  point calculation also, Your Honor, but this created a very

2  difficult situation for taxpayers that thought they were

3  going to a professional.  So not only did it interfere with

4  the collection of taxes for the United States Government, it

5  interfered with the lives of these citizens who thought they

6  were right with the U.S. Government and had met their tax

7  obligations, Your Honor, through no fault of their own.

8          THE COURT:  Mr. Holton.

9          MR. HOLTON:  Nothing further, Your Honor.  I

10  just -- this morning is the first I've heard of a

11  restitution figure and --

12          THE COURT:  Do you wish to have more time to

13  consider?

14          MR. HOLTON:  No, sir.  No, sir, I do not.  I do

15  not.  But we obviously -- Mr. Dibbi will accept, obviously,

16  whatever -- whatever fine the Court thinks is appropriate.

17  We would argue the $6,000 fine suggested by the probation

18  officer would be fair in this case.

19          THE COURT:  And you base that on what?

20          MR. HOLTON:  Well, the -- I base that on the fact

21  that I believe the sentencing guidelines take into effect

22  the conduct itself and the amount of -- the numbers of

23  taxpayers; and the amount of loss, so forth, is accurately

24  calculated.

25          THE COURT:  Would that make the $60,000 equally as

1    fair under that argument since it's within the advisory

2    guideline range?

3             MR. HOLTON:  It would make it certainly an option,

4    but I'm --

5             THE COURT:  But equally as fair as the 6,000 under

6    that reasoning.

7             MR. HOLTON:  It would, but I believe the -- once

8    the conduct in this case was concluded, Mr. Dibbi was

9    indicted, you know, he has come forward.  He has pled

10   guilty.  He has accepted responsibility.  He's done

11   everything that he's been asked to do for pretrial release.

12   I know, again, that gets some credit in the guidelines; but

13   I think in a defendant's case like him that that -- I ask

14   the Court to give that some consideration in deciding the

15   proper fine.

16            THE COURT:  Is there anything else you'd like to

17   say, Mr. Dibbi?

18        (Discussion between Mr. Holton and the Defendant.)

19            THE DEFENDANT:  No, sir.

20            COURT SECURITY OFFICER:  Your Honor, may I

21   approach?

22            THE COURT:  Yes.

23         (Discussion at the bench with the Court Security

24   Officer, not recorded.)

25            THE COURT:  Come in, Ms. Wilkins.

1          (Probation Officer Wilkins approached.)

2          THE COURT:  Ms. Wilkins, since you were not in

3    here to hear what I said -- I had asked the marshal not to

4    let people in while I was looking something up on the

5    computer and then failed to say it's all right now, we've

6    passed that point.  I'm going to take a recess for

7    Mr. Wright to bring you up on what's gone on and see if

8    there's anything you would like to contribute before I

9    pronounce a sentence in the case.  So we'll take a brief

10   recess.

11         (A morning recess was taken from 10:25 a.m. until

12   10:45 a.m.; all parties present.)

13         THE COURT:  Is there anything else anybody would

14   like to say?

15         MR. HOLTON:  Just I would add, Your Honor,

16   whatever fine the Court imposes, Mr. Dibbi will make

17   whatever arrangements to pay that fine as quickly as

18   possible.

19         THE COURT:  In determining a sentence in

20   Mr. Dibbi's case, I will, as I mentioned, take into

21   consideration his age and his health and, therefore, find

22   that a sentence of 30 months in the custody of the Bureau of

23   Prisons is appropriate taking that into consideration.

24         It is recommended that he be designated for a facility

25   where he can receive attention for his medical situation.

1    Specifically, it is recommended that the Bureau of Prisons
2    consider the facility at Butner.
3        It is determined that a period of supervised release
4    of 1 year will follow the 30-month period of incarceration
5    with the following special conditions in addition to the
6    standard conditions:  That Mr. Dibbi provide any financial
7    information requested by the probation officer to her or
8    him, not incur new credit charges.
9        And that includes these things, Mr. Dibbi:  obtaining
10   credit cards, opening lines of credit anywhere, opening
11   charge accounts anywhere or getting a loan from a commercial
12   lending institution without first discussing that and having
13   the approval of your probation officer to do that.  It
14   doesn't mean you can't do it.  You just need to get the
15   approval of your probation officer to do it.
16       It is determined that a fine of $60,000, considering
17   Mr. Dibbi's assets, would not work an undue hardship.  That
18   does take into consideration the loss to the Government
19   which it cannot recoup, but takes primarily into
20   consideration the cost of incarceration as reflected in the
21   presentence report for the 30 months of the sentence.
22       The $200 special assessment is also due and payable
23   immediately, as is the fine.
24       There is no apparent reason to give any additional
25   time to pay either; but, Mr. Holton, I will hear you if

1    Mr. Dibbi feels he needs some additional time to make

2    arrangements to pay.

3            MR. HOLTON:  Well, I –– we would request some

4    period of time of 30 days or a couple weeks, if the Court

5    would consider, to make –– try to make arrangements.

6            THE COURT:  Thirty days from today?

7            MR. HOLTON:  Yes.

8            THE COURT:  Thirty days from today.

9        Mr. Dibbi, you do have, of course, the right to appeal

10   from this sentence.  That would have to be done within 14

11   days of the time the written judgment is filed with the

12   Clerk's office.  So you and Mr. Holton talk about what you

13   would like for him to do so he will know what you want him

14   to do when the judgment is filed.

15       Anything further, Mr. Holton, you know of that we

16   should address?

17           MR. HOLTON:  Your Honor, he has been on pretrial

18   release and I believe the Government does not oppose him

19   remaining under the same conditions.

20           THE COURT:  And I will allow him to do that.

21           MR. CHUT:  And I do not object, Your Honor.

22           THE COURT:  I will allow him to do that.

23           MR. HOLTON:  Thank you.

24           THE COURT:  We will set a date of July the 8th as

25   the opportune date.

1      Mr. Dibbi, I'm going to allow you to remain on the

2    same conditions of pretrial release that you have been

3    under.  If you receive a designation from the Bureau of

4    Prisons as to where you should report and when you should

5    report, do that when they tell you to where they tell you

6    to.

7      If July the 8th is approaching and you have not

8    received that designation, but you are in conformity with

9    your conditions of pretrial release, Mr. Holton will file a

10   motion with the Court asking the Court to extend that time;

11   and if you are in compliance with your pretrial release

12   terms, the Court would probably extend the time so that you

13   could report voluntarily.

14     However, if July the 8th comes and you have not

15   received your designation and reported and the Court has not

16   extended that time, on July the 8th at twelve noon you

17   should report to the marshal's office down at this end of

18   this hall, second floor of this building, by twelve noon.

19     A failure to do that, if the Court has not extended

20   the time or you have not reported, would be a separate

21   felony violation.  So make sure that doesn't happen.  Make

22   sure you stay in touch with Mr. Holton and keep him apprised

23   of what's going on.

24     Mr. Chut, do you know of anything else?

25          MR. CHUT:  I do not, Your Honor.  Thank you.

1          THE COURT:  Thank you all.

2          MR. HOLTON:  Thank you.

3      (Proceedings concluded at 10:55 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2      I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO
3  HEREBY CERTIFY:

4      That the foregoing is a true and correct transcript of
the proceedings had in the within-entitled action; that I
5  reported the same in stenotype to the best of my ability and
thereafter reduced same to typewriting through the use of
6  Computer-Aided Transcription.

7

8  /s/Lori Russell, RMR, CRR           Date:  6/7/10
Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25